1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

E. M.,[1]

            Plaintiff,

    v.

ANDREW SAUL,[2]

          Defendant.

Case No.  19-cv-02717-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 18, 21

## I.     INTRODUCTION

Plaintiff E.M. brings this action challenging the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner"), denying E.M.'s application for disability benefits under Title II of the Social Security Act.  After the application was denied initially and upon reconsideration, a hearing was held before an administrative law judge ("ALJ") on February 22, 2018.   The ALJ denied E.M.'s application in a written decision dated May 31, 2018 in which she found that E.M. was not disabled from his alleged onset date of April 2, 2015.  The Appeals Council denied E.M.'s request for review on March 26, 2019, making the ALJ's decision the final decision of the Commissioner.   The parties filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed below, E.M.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings.[3]

---

[1] Because opinions by the Court are more widely available than other filings and this order contains potentially sensitive medical information, the Court refers to the plaintiff only by his initials.  This order does not alter the degree of public access to other filings in this case provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).
[2] Andrew Saul was confirmed as Commissioner while this action was pending, and is therefore substituted as the defendant as a matter of law. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[3] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.      BACKGROUND

### A.    Education and Employment

E.M. is a 55-year-old man with a high school education.  Administrative Record ("AR") at 101.  He worked as a water system operator from 1996 to 2003.  *Id.* at 226.  Between 2003 and 2010, E.M. was self-employed as a mechanical technician but had limited earnings because he suffered from depression during this period.  *Id.* at 196, 226, 295.  In 2011, E.M. began to work in spa repair with a friend, repairing spa tables and motorized chairs and removing and replacing motors and hydraulic pumps.  *Id.* at 227, 295.  Although E.M. continued to work in spa repair after his April 2015 alleged onset date, when he had spinal fusion surgery (discussed below), he did "very, very little." *Id.* at 59, 196.  Starting in November 2016, E.M. began working part-time as an Uber driver.  *Id.* at 295.  In a work background statement, E.M. noted that he drove for Uber "when [his] condition allow[ed]." *Id.* at 271.

### B.    Medical Record Summary

E.M. alleges disability due to "[l]ower back problems," "[m]iddle back fracture," and "[s]evere pain in right knee." *Id.* at 90.  In 1984, E.M. hurt his left hand in an accident with a table saw which required "multiple surgeries." *Id.* at 529.  The next year, E.M. underwent "[f]oot tendon surgery." *Id.* at 572.  In 2011, he was rear-ended in an automobile accident, resulting in a "T11-12 compression fracture." *Id.* at 575 (2016 note describing an automobile accident "five years ago").

On January 30, 2015, E.M. saw Dr. Alexander Iezza for an orthopedic consultation.  *Id.* at 443–44.  Dr. Iezza summarized E.M.'s condition:

> [E.M.] notes that he has a history of low back pain that dates back to an injury that occurred in high school football.  Over the years, his back pain slowly worsened.  In the last several years, it has become much worse and he has also noted the onset of left buttock and thigh pain.  Pain is associated with numbness and tingling.  Pain is burning in nature.  He notes it occurs with standing and walking and subsides after sitting down for 5-10 minutes.  He can only walk about two blocks before he has to stop and sit.  He is taking Soma, Norco, and Advil for pain.

*Id.* at 443.  Dr. Iezza took x-rays, which revealed "severe disc space narrowing" at L5-S1 and mild narrowing at L4-5.  *Id.* at 444.  He also referred E.M. for a lumbar MRI, *id.*, which was performed

2

United States District Court
Northern District of California

on February 13, 2015.  *Id.* at 492.

E.M. returned to Dr. Iezza on February 24, 2015.  *Id.* at 441-442.  E.M. told the doctor that his symptoms had not changed and continued to be "severe and disabling."  *Id.*  Dr. Iezza wrote that the MRI performed on February 13, 2015 showed "L5-S1 isthmic spondylolisthesis with severe left greater than right neural foraminal stenosis."  *Id.* at 441; *see also id.* at 492 (full report finding that "T11 and T12 vertebral bodies show mild anterior wedge compression deformity" and "[r]eactive endplate changes" at L5-S1).

On March 19, 2015, E.M. saw Dr. Robert Goodman, his primary care physician to whom he was "well known . . . for over twenty years," for a pre-admission medicine consultation in connections with lumbosacral spine surgery (hereinafter, "fusion surgery") scheduled for April 2, 2015 with Dr. Iezza.  *Id.* at 312.  Dr. Goodman described E.M.'s chief complaint as "[s]evere lower back pain radiating into the left lower extremity times several months."  *Id.*  Dr. Goodman noted that E.M. had a body mass index ("BMI") of 45 and was "morbidly obese."  *Id.*

On March 30, 2015, E.M. saw Dr. Alexander Iezza for "a preoperative history and physical" in advance of the scheduled fusion surgery.  *Id.* at 310.  E.M. described having experienced back pain for years that had worsened in recent months, particularly when he walked or stood up.  *Id.*  Dr. Iezza noted: "Past nonsurgical treatment has been tried for more than 12 weeks. . . . His pain and symptoms continue to worsen despite conservative treatment measures."  *Id.*  A physical exam revealed that E.M. had "5/5/ strength through bilateral lower extremities" and a "[n]egative straight leg raise test" without range of motion pain in his hip or knees, but that "[w]ith thoracolumbar range of motion, there [was] low back pain and guarding."  *Id.*

Dr. Iezza also described the results of E.M.'s imaging studies:

> Plain films obtained on 01/30/2015 of the lumbar spine show an isthmic spondylolist hesis with approximately 15 mm of anterolisthesis at L5-S1.  There is severe disk space narrowing at [this] level.  At L4-L5, there is mild disk space narrowing and normal alignment. MRI obtained on 02/13/2015 at Santa Rosa Imaging shows L5-S1 isthmic spondylolisthesis with severe, [left] greater than right, neural foraminal stenosis.  At all other lumbar levels, there is mild degenerative change but no focal herniation or stenosis.

*Id.* at 311.  Dr. Iezza's assessment was "L5-S1 spondylolisthesis with severe, left greater than

right, neural foraminal stenosis." *Id.*

Dr. Iezza and Dr. Douglas Jicha performed the spinal fusion surgery on April 2, 2015. *Id.* at 314-315.   The post-operative diagnosis was obesity, "[l]ow-grade unstable L5-S1 isthmic spondylolisthesis with severe neural foraminal stenosis[,]" and "[c]hronic low back pain and severe left lower extremity neurogenic claudication." *Id.* at 315.

On April 17, 2015, E.M. visited Dr. Luis Garcia for a post-surgical follow-up. *Id.* at 439. Dr. Garcia noted that E.M. reported feeling "amazingly better" but also that he was experiencing "quite a bit of pain" his left lower abdomen and his low back." *Id.* Dr. Garcia refilled E.M.'s prescription for Percocet (oxycodone and acetaminophen). *Id.* Two weeks later, Dr. Iezza reported that E.M. was "doing great" and experiencing improvement in his sciatica pain and left side numbness. *Id.* at 438. Dr. Iezza noted that E.M. was "taking Norco for pain." *Id.*   E.M.'s sciatica had improved, as had the numbness in his left leg and thigh. *Id.*

On May 15, 2015, Dr. Garcia noted that E.M.'s "bilateral lower extremity sciatic-type pain is completely resolved." *Id.* He noted that E.M. had "decreased use of narcotics to two Norco tablets a day" and recommended that E.M. continue to take Norco for pain "as needed." *Id.* at 437. Dr. Garcia referred E.M. to physical therapy. *Id.*

E.M. saw Dr. Allyson Yeo for an initial physical therapy evaluation on June 1, 2015. *Id.* at 414–16. E.M. reported that his pain was a seven out of ten and that he felt "like his screws and rods are 'coming loose.'" *Id.* at 414. She assessed his loss of function as being moderate in degree. *Id.* E.M. described his baseline as being unable to walk long distances or push objects and having "Much Difficulty" climbing stairs. *Id.* According to the objective examination, E.M. had "4/5" hip abduction strength on both sides, "-4/5" strength in both sides in hip extension, knee extension, and knee flexion, and "+3/5" strength in his hip flexion on both sides. *Id.* In his lumbosacral spine, E.M. also displayed 40% flexion, 15% left rotation, 20% right rotation, and 50% bending to the side on both left and right. *Id.* at 415. In Dr. Yeo's opinion, E.M.'s rehabilitation potential was "excellent." *Id.* On June 19, 2015, E.M.'s range of motion hadn't changed but he could now walk long distances, push, and climb stairs with "Little Difficulty." *Id.* at 412–13.

United States District Court
Northern District of California

1   At a visit to Dr. Iezza on June 3, 2015, E.M. reported that his "overall pain and mobility

2   ha[d] continued to improve" since his last visit but that he had increased low back pain and spasms

3   after the start of physical therapy. *Id.* at 435. Dr. Iezza noted that E.M. was taking 3 tablets of

4   Norco a day for pain. *Id.* He advised E.M. that he would not continue to prescribe pain medication

5   after the three-month post-operative mark and that at that point E.M. would have to have pain

6   medication prescribed by his primary care physician or a pain management specialist. *Id.* Dr.

7   Iezza listed "[c]hronic narcotic dependence" as one of E.M.'s diagnoses. *Id.*

8   At his next visit with Dr. Iezza, on July 1, 2015, E.M. reported that he had been "walking

9   two miles per day for exercise and feeling great." *Id.* at 433. However, he experienced several

10   days of low back and left and right leg pain after falling and twisting his back the week before. *Id.*

11   E.M. reported he had not returned to his "preinjury baseline" but the pain was improving. *Id.* Dr.

12   Iezza noted that E.M. had "weaned himself from Norco[.]" *Id.*

13   On October 14, 2015, E.M. told Dr. Iezza that he was having pain in his middle back that

14   was "associated with spasm" and "less severe" low back pain. *Id.* at 431. Dr. Iezza took x-rays

15   that day which revealed stable alignment, reduced space between at L5-S1, and corrected

16   spondylolisthesis. *Id.* However, the x-rays also showed "mild-to-moderate disc space narrowing

17   at L2-L3, L3-L4, and L4-L5." *Id.* Dr. Iezza described E.M.'s diagnosis as "[s]tatus post L5-S1

18   fusion" and "[c]hronic mid back pain and low back pain and spasm." *Id.*

19   E.M. saw Dr. Karen S. Kurtovich for physical therapy on October 19, 2015. *Id.* at 407.

20   Despite his injury, E.M. "stated that overall, he has been improving." *Id.* At this visit, the

21   physical therapist's muscle testing gross assessment was "4/5" and the tenderness in his spine and

22   quadratus lumborum was "3=Wincing and withdraw[a]l." *Id.* E.M. also had a 50% flexion range

23   of motion, rotation 70% on both sides, and 20% side bending on both sides. *Id.* at 407–08. His

24   tenderness was unchanged at his appointment on October 21, October 28, and October 30. *Id.* at

25   405, 403, 401.

26   On October 20, 2015, E.M. saw Dr. Michael Grafe to address pain in his thumbs. *Id.* at

27   430. Dr. Grafe diagnosed E.M. with "bilateral thumb arthritis, right more symptomatic than left."

28   *Id.* Dr. Grafe sent E.M. home with a brace for his thumb and noted that, if his symptoms did not

United States District Court
Northern District of California

1   improve, they could try corticosteroid injections.  *Id.*  E.M.'s symptoms had not improved when

2   he returned to Dr. Grafe on December 1, 2015.  *Id.* at 429.  Dr. Grafe sent E.M. home with another

3   brace and suggested corticosteroid injections should symptoms continue to worsen.  *Id.*  Dr. Grafe

4   also noted that, in his opinion, E.M.'s arthritis symptoms were not severe enough to require

5   surgery.  *Id.*

6       Dr. Goodman referred E.M. to Dr. Michael Tran for pain management; Dr. Tran performed

7   an initial consultation on October 22, 2015.  *Id.* at 487–90.  According to Dr. Tran, E.M.'s April

8   2015 surgery helped with his sciatica pain but did not resolve his back pain and radiating muscle

9   spasms.  *Id.* at 487.  E.M. told Dr. Tran that this pain was constantly seven or eight out of ten in

10  severity.  *Id.*  Dr. Tran recommended stronger medication and prescribed Norco, Lidoderm, and

11  Flexeril.  *Id.* at 489.

12      On November 4, 2015, E.M.'s physical therapist, Dr. Kurtovich, observed that E.M.'s

13  tenderness had improved so that he now only experienced "2=[p]ain with wincing" on both sides.

14  *Id.* at 399.  At that visit, E.M. also indicated that he was enjoying exercise in a swimming pool and

15  walking to his mailbox and back.  *Id.*  On November 6, 2015, Dr. Kurtovich summarized E.M.'s

16  progress and condition:

> Overall Condition is: Improving.  Pt states he's improving.  Pt states
> he feels better after PT.  Pain level is 4 to 5.  Pt states he has pain L
> L/S, hip ER area.  Pain R side has diminished.  Pt states he's sore
> today, due to getting into/out of his 4 wheel drive truck which he has
> to climb up into, due to his short stature.  Pt states he feels better with
> doing the pool exercises, more stable but looser.  Pt states he can walk
> 1/4 to 1/2 mile now.

21  *Id.* at 397.  At that appointment, E.M.'s tenderness had decreased to "2=Pain with wincing" on the

22  left side and no pain or tenderness on the right side.  *Id.*  However, on November 11, 2015, E.M.'s

23  pain had increased to a five or a six out of ten, which he attributed to his increased activity around

24  his ranch.  *Id.* at 395.

25      On November 13, 2015, E.M. experienced some symptom improvement, although he

26  continued to have increased pain when getting in and out of his car and his truck and when

27  "driving a clutch."  *Id.* at 393–94.  On November 17, 2015, Dr. Kurtovich noted that E.M.'s pain

28  had decreased while his functional capacity had increased.  *Id.* at 392.  Two days later, on

November 19, 2015, Dr. Kurtovich observed continuing improvement but noted that E.M.'s activity tolerance was still limited by his difficulty bending. *Id*. at 389–90. Dr. Kurtovich's notes reflect that E.M. continued to improve between November 24 and December 31, 2015. *Id*. at 367–87 (treatment notes). However, he also continued to have pain when sitting, standing, or walking. *See, e.g.*, *id.* at 387 (noting pain while sitting on the couch to watch television); 377 (noting increased pain when standing); 373 ("Tolerance for [activity] is improving, but standing and ambulation remain limited"); 371 (reporting pain "when standing"). Dr. Kurtovich also noted that E.M. had increased pain with activity. *See id*. at 369 (reporting increased pain after "loading wood from truck to woodpile, twisting, but avoiding flex, x 30 minutes").

On January 6, 2016, E.M. reported to Dr. Kurtovich that he was experiencing increased pain in his lower back, hip, and upper back. *Id*. at 365, 363. Dr. Kurtovich's objective examination observations did not change. *Id*. E.M. guessed that this pain increase was the result of an old fracture. *Id*. at 363. His pain stabilized by January 20, 2016. *Id*. at 359 ("Pt states that he has been feeling 'pretty good' lately, with a low amount of pain" despite some soreness after gardening). On February 9, 2016, Dr. Kurtovich noted that the tenderness in E.M.'s spine was "3=Wincing and withdraw[a]l." *Id*.at 355.

When he returned to Dr. Iezza, on February 1, 2016, E.M. complained that his lower back and buttock pain had returned, along with numbness in both thighs. *Id*. at 428. Dr. Iezza ordered an MRI. *Id*. The MRI was performed on February 4, 2016. *Id*. at 424. According to Dr. Iezza, who discussed the findings with E.M. on February 19, 2016, the MRI showed disc and joint degeneration, but no root impingement. *Id*. at 426. In Dr. Iezza's opinion, E.M.'s condition would not improve with additional surgery. *Id*. at 427. Dr. Iezza also noted that E.M. saw Dr. Tran to schedule epidural injections to manage his pain. *Id*. at 426.

On February 29, 2016, E.M. underwent a CT scan of his lumbar spine. *Id*. at 420. This scan revealed "[m]ultilevel disc bulging/protrusion without definite neural impingement. Mild endplate edema centered at T6-7 only suggests segmental stress. This is the apex of the thoracic kyphosis." *Id*. at 573.

On March 7, 2016, E.M. was seen by NP Dobrov for Dr. Tran. *Id.* at 476. E.M. reported

that his back pain was at a seven out of ten level without pain medication and four out of ten with pain medication. *Id.* He was continuing to take Norco and Flexeril and use a Lidoderm patch. *Id.* On March 17, 2016, E.M. received an epidural injection in his spine by Dr. Tran. *Id*. at 491. As of January 2, 2018, E.M. had received seven such injections from Dr. Tran. *Id*. at 684. E.M. reported that the March 17, 2016 injection reduced his pain "by 50-60%." *Id*. at 575.

E.M. saw NP Dobrov for pain management and medication refills on April 6, 2016. *Id*. at 575–77. E.M. reported that the combination of pain medication, lack of activity, and rest helped him control his pain such that he could "complete necessary activities of daily living such as walking, shopping and light household chores." *Id*. at 575. Other than his back pain and spasms, E.M. presented as "generally healthy." *Id*. E.M. reported feeling seven out of ten pain when he was not taking medication and four out of ten when he was taking medication. *Id*. NP Dobrov wrote that E.M.'s "[a]ctivities of daily living including work, concentration, mood, sleeping pattern and overall functioning are moderately impacted by his pain." *Id*. at 576. NP Dobrov also wrote that E.M. had "tried and failed Conservative Measures" of pain management. *Id*. He was still able to perform modified activities of daily living. *Id*. E.M.'s pain levels and ability to perform basic activities was largely unchanged through June of 2016. *Id*. at 569–77.

E.M. continued to report eight to nine out of ten pain when not on his medication and six out of ten pain with his medication. *Id*. at 562. He estimated that his medication improved his independence by around 30%. *Id*. These pain levels continued through January 5, 2017. *Id*. at 546–565, 639–641).

Dr. S. Amon evaluated E.M.'s medical record in connection with his initial application for disability benefits on April 12, 2016. *Id*. at 90–97. Dr. Amon noted that E.M. had performed work after his alleged onset date and that such work was not "an unsuccessful work attempt." *Id*. at 91. Dr. Amon noted that both of E.M.'s impairments—a spine disorder and dysfunction of major joints and—were severe. *Id*. at 94. Dr. Amon found that E.M.'s statements about the severity of and limitations caused by his conditions were "[p]artially [c]onsistent" with the medical evidence. *Id*. at 95.

Dr. Amon noted that E.M. had exertional limitations such that he could lift or carry twenty

United States District Court
Northern District of California

pounds occasionally and ten pounds frequently, and that he could sit, stand, or walk for "[a]bout 6 hours in an 8-hour workday." *Id*. at 96.  His ability to push or pull was "[u]nlimited." *Id*.  In terms of postural limitations, Dr. Amon opined that E.M. could frequently balance and crouch, and occasionally climb ramps, stairs, ladders, ropes, and scaffolds, occasionally stoop and kneel, and occasionally crawl. *Id*.  Finally, Dr. Amon wrote that E.M. was limited with respect to handling (gross manipulation) and fingering (fine manipulation). *Id*. at 96–97.  Overall, Dr. Amon found that E.M. was not disabled. *Id*. at 99.  Consultative physician Dr. S. Hanna reviewed the record at the reconsideration stage and agreed with Dr. Amon's findings. *Id*. at 102–12.

On January 2, 2018, Dr. Andrew Burt conducted an orthopedic examination and evaluation of E.M. for his disability application. *Id*. at 682–95.  Dr. Burt examined E.M. and also reviewed his medical records, diagnosing E.M. with "chronic spinal pain" and opining that his prognosis was "poor/guarded." *Id*. at 691.  According to Dr. Burt, E.M.'s pain resulted in a limited range of motion, muscle spasms, an abnormal gait, sensory loss, muscle weakness, and impaired sleep. *Id*. at 692.  In Dr. Burt's opinion, these symptoms would "[f]requently" interfere with E.M.'s ability to concentrate at work. *Id*.  Dr. Burt further opined that E.M. could only walk for two city blocks at a time, sit for ten minutes at a time, and stand for ten minutes at a time. *Id*. at 692–93.  He estimated that E.M. could stand and walk for less than two hours during an eight-hour work day and could only sit for around two hours over the course of an eight hour day. *Id*. at 693.  He wrote that E.M. would likely need unscheduled breaks during the day to rest, lasting around half an hour. *Id*.  According to Dr. Burt, E.M. would also need to elevate his legs a foot in the air for half of the work day. *Id*.

With respect to E.M.'s functional limitations, Dr. Burt checked boxes indicating that E.M. could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift or carry twenty to fifty pounds. *Id*. at 694.  In addition, he checked boxes indicating that E.M. could never twist, stoop or bend, crouch or squat, or climb ladders. *Id*.  He found that E.M. could rarely climb stairs. *Id*.  Finally, Dr. Burt estimated that E.M. would have good days and bad days, and that E.M. would likely miss more than three work days each month. *Id*.

United States District Court
Northern District of California

### C.   Adult Function Report

E.M. completed an adult function report in support of his application for disability benefits on March 18, 2016. *Id*. at 217–225.  He reported that his injuries "[p]revent[ed] [him]from lifting, kneeling, bending, reaching.  Getting into certain positions.  Moving heavy equipment.  Installing heavy parts." *Id*. at 217.  His daily activities were varied and he cared for his pets, for whom he provided "food, water, love." *Id*. at 218.  When asked what activities he could engage in before his injury that he no longer could participate in, E.M. replied that he could no longer "walk distances, run, hike, Jump etc." *Id*. He also reported that the pain affected his sleep. *Id*.

E.M. wrote that he could prepare his own meals each day and perform household chores such as dusting, vacuuming, and sweeping. *Id*. at 219.  He could shop for himself and went outside "every day," either walking, driving, or riding in a car. *Id*. at 220.  His hobbies included watching television, although he had trouble finding a comfortable position, and he spent time doing "everything" with other people. *Id*. at 221.  However, his injuries interfered with the social activities he could participate in; E.M. wrote that he couldn't "go places where [he] ha[d] to stand such as car shows, the fair, etc." *Id*. at 222.  He checked boxes indicating that pain from his injuries affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. *Id*. He could walk 10 to 15 minutes without needing to stop and rest. *Id*.  He rated his ability to handle stress and changes in routine as "fair." *Id*. at 223.  Finally, E.M. noted that he took Norco and flexeril, which caused him to feel "sleepy." *Id*. at 224.

### D.   Administrative Hearing

A hearing before ALJ Serena Hong was held on February 22, 2018 in San Rafael, California.  AR at 43.  E.M. was represented at the hearing by non-attorney Dan McCaskell. *Id*. The ALJ questioned E.M. after administering the oath. *Id*. at 50.  E.M. testified that he lived alone with his animals and that his girlfriend visited often. *Id*.  His only income was occasionally driving for Uber, which he was unable to do full-time. *Id*.  E.M. explained that if he worked one day, he would have to take a day or two off to recuperate. *Id*. at 50–51.  He testified that he could not drive on days when he took one of his medications. *Id*. at 51.  E.M. testified that he had no other source of income. *Id*.

The ALJ asked about E.M.'s weight.  *Id*. at 51.  He told her that he was five foot, five inches tall and weighed 243 pounds.  *Id*.  He had lost between thirty and thirty-five pounds in the seven or eight months leading up to the hearing.  *Id*.  E.M. testified that he lost the weight because he couldn't afford food:

> [B]asically, we can't afford food, like which you'd go to the store and get a bunch of hamburger or things like that, we buy a big bag of rice that lasts about two weeks, a 40-pound bag of rice and we grow tons of vegetables and every now and again we'll buy some hamburger and we have some chickens and we have eggs . . . . And that's made me lose a lot of weight because we really can't go and buy steaks.

*Id*. at 51–52.  The ALJ asked E.M. if he was "raising chickens" and he responded, "[n]ot so much raising, we have like three to four layers and they just basically lay eggs." *Id*. at 52.  The ALJ did not ask E.M. to describe what (if any) gardening tasks he performed and whether he received assistances in growing vegetables from his girlfriend or anyone else.

E.M. testified that he had gone through the tenth grade but had taken the California proficiency exam instead of completing high school.  *Id*. at 52–53.  He testified that he trained for "a few difference construction jobs" when he was young but that he was unable to continue in that field because of his hand injury.  *Id*. at 53.  E.M. also worked briefly in water systems maintenance and spa equipment repair, but stopped after his injury.  *Id*. at 53–59.  He testified that at the time of the hearing he was driving for Uber and earning between $100 and $150 per week but that some weeks he could not work at all.  *Id*. at 60–61.  E.M. explained that working for Uber allowed him to "make [his] own hours" and decrease his hours as his pain required.  *Id*. at 61.

E.M. described how he tailored his Uber schedule to accommodate his pain:

> I couldn't commit to anybody for X number of hours, not knowing what shape I'd be in the next day.  So Uber was one of those things where you can make your own hours . . . . If I could only drive, you know, whatever it was could drive and a lot of times I would go to the city and that drive hurt me, so I would have to stop for maybe 10/15 minutes and maybe get a cup of coffee . . . . walk that off and then go back to work for another 20/30 minutes . . . . stop and do the same thing.  So it's not, it's not like I can work solid when I go back to work.  I have to take a lot of breaks.

*Id*. at 61–62.  E.M. testified that his pain prevented him from concentrating and relief only came when he lay down.  *Id*. at 62.  The pain was concentrated in his legs and back and felt "[l]ike if

someone was twisting your skin." *Id*. at 63.  E.M. described what it was like to go grocery shopping, testifying that he "dread[ed] it because [he] never got through it without being in such pain that sometimes [he had] to just stop and go out in the car and let [his] girlfriend finish." *Id*. at 64.

E.M.'s attorney questioned E.M. about the vehicle he used when he drove for Uber.  *Id*. E.M. testified that he had leased a car and was making monthly payments so he could drive for Uber.  *Id*. at 65–66.  When he drove, E.M. testified, he took several thirty minute breaks unless his leg started to spasm, which required him to stop driving altogether and take a muscle relaxer or pain medicine.  *Id*. at 68–69.

When the ALJ asked E.M. when he became unable to work, E.M. testified that he "hit the wall" on April 2, 2015 after two years of trying to work and having to take time off due to back problems.  *Id*. at 54.  During that period, each time E.M. injured his back he was seen by Dr. Goodman, who would prescribe "maybe a 10-day course of like a Norco and a Soma or something." *Id*.  According to E.M., the medication helped E.M. to return to work, but he still felt "very unstable." *Id*.   Then at one point he went back to work but could not walk, and when he went to a chiropractor for help he "went into spasms" so severe that he had to be walked out; he then went straight to Dr. Goodman on an emergency basis.  *Id*. at 54.  According to E.M., that was when Dr. Goodman referred him to Dr. Iezza, who recommended surgery "immediately." *Id*. at 55.

E.M. testified that Dr. Iezza scheduled "a very radical surgery" a month later (the fusion surgery performed on April 2, 2015).  *Id*.  He testified that although Dr. Iezza considered the operation a "success" he continued to experience "lightning bolt pain" and made minimal progress after the surgery.  *Id*.

E.M. testified that Dr. Iezza then ordered an MRI and told E.M. that it showed a screw protruding through the bone, which might explain why E.M. was "hurting so bad" in one spot.  *Id*. at 71.  When E.M. continued to experience severe pain, Dr. Iezza ordered another MRI.  *Id*.  E.M. said he was still unable to walk during this time.  *Id*. at 72.

E.M. testified that he saw Dr. Tran for a second opinion.  *Id*. at 73.  According to E.M., Dr.

Tran looked at the MRI and CAT scan and told him "do you realize that you have a broken back and you still have significant nerve impingement and you still have . . . I think he said three other things and he goes and no wonder you're in so much pain." *Id.* E.M. testified that Dr. Tran prescribed pain medication and muscle relaxers and also administered "five or six epidural shots." *Id.* Even with the epidural injections, E.M. testified, his back "still hurts worse than it did." *Id.* at 74.

Next, E.M. responded to questions by his attorney about a surgery he underwent on his left hand in 1985. *Id.* at 75. E.M. testified that his index and middle fingers were "completely destroyed" by a "blade." *Id.* at 75–76. He recounted that he tried working as a busboy and a caterer after the surgery, but he was unable to do those jobs because of the pain and lack of dexterity in his hand. *Id.* at 76–77. He also had difficulty typing because he couldn't bend his middle finger and had trouble with finger dexterity. *Id.* at 70.

The ALJ then heard the testimony of Alan Boroskin, the vocational expert ("VE"), who addressed E.M.'s past work. *Id.* at 79. The V.E. explained that there was no listing for an Uber driver in the Dictionary of Occupational Titles ("DOT") but that the closet analogue was a cab driver, a semi-skilled job with an SVP of three and a medium exertional level. *Id.* at 80. According to the VE, E.M.'s work as a health spa repair person was "skilled with an SVP of 7, medium exertional per the DOT, heavy as described by the claimant." *Id.* The VE classified E.M.'s work as a water systems operator as a skilled job that was "heavy exertional as performed, medium per the DOT." *Id.* at 81.

The ALJ asked the VE whether the following hypothetical individual could perform E.M.'s past work:

> If you assume a hypothetical individual of the claimant's age and education and with the past jobs that you just described and further assume that the individual was limited to performing work at the light exertional level but cannot climb ladders, ropes and scaffolds and can perform other postural maneuvers such as stopping, crouching and crawling on an occasional basis. The individual was limited to frequent handling and fingering . . . .

*Id.* at 81. The VE testified that such a person could not perform E.M.'s past work. *Id.* The ALJ asked whether any work would be available for such a person at the light exertional level. *Id.* The

VE testified that such a person could work as a ticket seller, an unskilled job with an SVP of 2 and 241,300 jobs nationally, an information clerk, an unskilled job with an SVP of 2 and 62,700 jobs nationally, or as a packer and packager, an unskilled job with 344,500 jobs nationally. *Id.* at 81-82.

The ALJ then posed a second hypothetical:

> If you assume the same individual as in hypothetical number one, however this time the individual was limited to performing work at the sedentary level, all the other limitations remain the same, would there be jobs?

*Id.* at 82. The VE testified that there would be, including a document preparer, an unskilled, sedentary job with an SVP of 2 and 136,800 jobs nationally; a charge account clerk with an SVP of 2 and 33,400 jobs nationally; and a food and beverage clerk, a sedentary unskilled job with an SVP of 2 and 25,8000 jobs nationally. *Id.* The ALJ asked whether E.M. had any transferable skills from his past work that could transfer to work suitable for the sedentary person described in the ALJ's second hypothetical. *Id.* The VE testified that a lock assembler, a semi-skilled, sedentary job with an SVP of 3 and 58,500 jobs nationally, would be suitable for someone with the limitations described in the second hypothetical. *Id.* at 83.

The ALJ offered a final hypothetical:

> If you assume the same individual as in hypothetical number two, however add to that that the person would be off task or non-productive for any number of reasons and that may be a need for an additional break, a lack of concentration, a need to be absent from the workplace, any number of reasons the person was off task or non-productive 20 percent of the workday or work week, would there be jobs?

*Id.* The VE replied that there would not be any jobs for someone with those limitations. *Id.* The VE explained that his testimony on this matter was informed by his "professional opinion and experience" rather than the Dictionary of Occupational Titles. *Id.* at 84.

E.M.'s attorney asked the VE whether a person would be able to perform such sedentary jobs if they could not do any "fine manipulations" with their non-dominant hand and could only perform "occasional grasping." *Id.* The VE replied that a person with those limitations could still perform the jobs he previously mentioned because those jobs mostly required telephone work

14

performed with the dominant hand.  *Id.*  When E.M.'s attorney asked whether the jobs would require work on a computer, the VE replied that the DOT did not indicate those jobs required computer work.  *Id.* at 84–85.  In the VE's experience, these jobs did require handwriting.  *Id.* at 85.  Regarding holding a phone and working on the computer, the VE theorized that these jobs could be done with a headset such that a worker could work on the computer without having to hold the phone.  *Id.* at 86.

### E.    Regulatory Framework for Determining Disability

When a claimant alleges a disability and applies to receive Social Security benefits, the ALJ evaluates the claim using a sequential five step process.  20 C.F.R. § 404.1520(a)(4).  At step one, the ALJ determines whether the applicant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(I).  Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . that the claimant does for pay or profit."  20 C.F.R. § 220.141(a)–(b).  If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically determinable impairment.  Impairments are severe when "there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not suffer from a severe impairment, she is not disabled; if she does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing").  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled.  If not, the ALJ moves to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or "RFC," to assess whether the claimant could perform her past relevant work.  20 C.F.R. § 404.1520(a)(1).  The RFC is a determination of "the most [the claimant] can do despite [the claimant's] limitations."  20 C.F.R. § 404.1520(a)(1).  The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that

United States District Court
Northern District of California

United States District Court
Northern District of California

1  lasted long enough for [the claimant] to learn how do to it."  20 C.F.R. § 404.11560(b)(1).  If the

2  claimant is able to perform past relevant work, she is not disabled; if she is not able to perform

3  such past relevant work, the ALJ continues to step five.  In the case of claimants who are fifty-five

4  or older, are restricted to sedentary work, have no transferable skills, and have not completed any

5  relevant vocational education, the Commissioner will usually not offer any evidence of work

6  meeting the claimant's RFC and the ALJ will decide disability based on the claimant's ability to

7  perform past work.  20 C.F.R. § 404, subpt. P, app. 2 § 201.00(d).

8         At the fifth and final step, the burden shifts from the claimant to prove disability to the

9  Commissioner to "identify specific jobs existing in substantial numbers in the national economy

10  that the claimant can perform despite her identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111,

11  1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the

12  Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant

13  is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

14     **F.    The ALJ's Decision**

15         In her written decision, the ALJ found that E.M. was not disabled.  AR at 31–38.  First,

16  she found that E.M. met the insurance requirements of the Social Security Act and that he had not

17  engaged in substantial gainful activity since the alleged onset date of his disability.  *Id*. at 32.  The

18  ALJ found at step two that E.M. "has the following severe impairments: degenerative disc disease,

19  compression fracture of the thoracic spine, right knee dysfunction, obesity, and osteoarthritis in

20  the bilateral thumb."  *Id*.  The ALJ also addressed E.M.'s history of anxiety and depression, which

21  she found to be treated through medications and lacking "significant psychiatric testing or

22  treatment to support subjective complaints."  *Id*.  In assessing E.M.'s alleged functional limitations

23  related to his mental health, the ALJ found that E.M.'s limitations were mild in all four categories:

24  understanding, remembering, or applying information; interacting with others; concentrate, persist,

25  or maintain pace; and the ability to adapt and manage himself.  *Id*. at 32–33.  However, the ALJ

26  noted that she considered these mild impairments in assessing E.M.'s RFC.  *Id*. at 33.  At step

27  three, the ALJ found that E.M. did not have an impairment or combination of impairments that

28  equal any of the listings for impairments.  *Id*.  At step four, the ALJ found that E.M. had the RFC

United States District Court
Northern District of California

"to perform sedentary work . . . except that the claimant is limited to never climbing ladders, ropes or scaffolds; occasional postural activities (stooping, crouching, crawling, etc.); and frequently handling and fingering." *Id.*

The ALJ afforded "only some weight" to the opinion of Dr. Andrew Burt, finding his assessment of E.M.'s limitations to be "overly restrictive and inconsistent with the claimant's work activity." *Id.* at 35. In addition, the ALJ reasoned that the Dr. Burt's opinion "cites to vague examination results that are inconsistent with the claimant's conservative care and improvements following surgery." *Id.* Finally, she noted that much of Dr. Burt's opinion was based on E.M.'s subjective complaints rather than objective measures. *Id.* Specifically, the ALJ pointed to parts of the record showing "a normal gait, despite some tenderness and range of motion limitations." *Id.* (citing *id.* at 426, 576). In addition, the ALJ noted "negative straight leg testing" and success with conservative treatment, specifically medications. *Id.* (citing *id.* at 432, 476).[4] The ALJ accepted Dr. Burt's assessment of E.M.'s sedentary limitations as consistent with the overall record, but gave little weight to the rest of his findings. *Id.* She likewise gave "limited weight" to the opinions of the agency consultative physicians because they did not personally examine E.M. *Id.* at 35–36.

While the ALJ found that E.M.'s claimed impairments could reasonably be expected to cause the symptoms E.M. described, she also found that the evidence in the record was not consistent with the intensity, persistence, and limiting effects that E.M. claimed. *Id.* at 36. In addition, the ALJ found that E.M could not perform his past relevant work, but that he did have transferable skills from that past work. *Id.* Based on the V.E.'s testimony, the ALJ found that E.M. could work as a document preparer, a charge account clerk, a food and beverage order clerk, or a lock assembler. *Id.* at 37. Because these jobs exist in significant numbers in the national economy, the ALJ concluded that E.M. was not disabled. *Id.* at 37.

**G.    Issues For Review**

1.    Whether the ALJ provided sufficient reasons to give only partial weight to the

---

[4] The ALJ also cited "Ex. 9F, p.58." That page does not exist in the record.

1    opinion of Dr. Burt, an examining physician.

2        2.    Whether the ALJ improperly disregarded E.M.'s testimony about his subjective

3    symptoms.

4    **III.    ANALYSIS**

5        **A.  Legal Standard**

6        District courts have jurisdiction to review the final decisions of the Commissioner and may

7    affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

8    hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

9        When reviewing the Commissioner's decision, the Court takes as conclusive any findings

10   of the Commissioner that are free of legal error and supported by "substantial evidence."

11   Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

12   conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401.

13   (1971).  "'Substantial evidence' means more than a mere scintilla," *id*., but "less than

14   preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

15   1988) (internal citation omitted).  Even if the Commissioner's findings are supported by

16   substantial evidence, the decision should be set aside if proper legal standards were not applied

17   when weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting

18   *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must

19   consider both the evidence that supports and the evidence that detracts from the Commissioner's

20   conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

21   F.2d 993, 995 (9th Cir. 1985)).

22       **B.    The ALJ Erred When She Disregarded E.M.'s Subjective Symptom Testimony**

23       "The ALJ is responsible for determining credibility and resolving conflicts in medical

24   testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (*citing Allen v. Heckler*, 749

25   F.2d 577, 579 (9th Cir. 1984)).  The Ninth Circuit employs a two-part test to determine whether an

26   ALJ properly dismissed a claimant's subjective symptom testimony as less than credible:

27               First, the ALJ must determine whether the claimant has presented
              objective medical evidence of an underlying impairment "which
28            could reasonably be expected to produce the pain or other symptoms

United States District Court
Northern District of California

alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "Thus, the ALJ may not reject subjective symptom testimony. . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.").

Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *see also Robbins* [*v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)] ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

Because the ALJ found that E.M.'s claimed impairments could reasonably be expected to cause his symptoms, AR at 36, she was required to offer "specific, clear and convincing reasons" to reject E.M.'s subjective symptom testimony. *Smolen*, 80 F.3d at 1281. Here, the ALJ offered the following reasons to support her finding that E.M.'s allegations about his subjective symptoms were not credible: 1) the record from "treating sources" showed "good control" of E.M.'s pain with "routine care"; *id.*; *see also id.* at 35 (finding "conservative care and improvement after surgery"); and 2) his activities of daily living did "not support the degree of limitations alleged." *Id.* at 36. The Court concludes that these reasons are not specific, clear and convincing and therefore that the ALJ erred in discounting E.M. testimony about his subjective symptoms.

### 1. Conservative Treatment

The ALJ's first reason for rejecting E.M.'s subjective symptom testimony – that E.M.'s symptoms were well managed with conservative treatment is – not supported by the record, which reflects that the treatment E.M. received was neither conservative nor particularly effective from the perspective of managing E.M.'s symptoms.

First, the Court has found no authority to suggest that spinal fusion surgery such as the one performed on E.M. can be considered "conservative." Nor is there any evidence in the record that

it could be considered to be such in the context of this case.  Likewise, the multiple epidural injections E.M. received do not constitute conservative treatment.  *See Saccomano v. Saul*, No. 18-CV-02624-JCS, 2019 WL 4751888, at *15 (N.D. Cal. Sept. 30, 2019) ("the ALJ offers no justification for classifying epidural shots, which are administered by a surgeon and require conscious sedation, as 'conservative' ") (citing *Garrison v. Colvin*, 759 F.3d 995, 1015 n.20 (9th Cir. 2014)).

The extensive evidence in the record reflecting that E.M. was taking narcotic pain medications, including Norco (which is a combination of acetaminophen and the narcotic drug hydrocodone), on an ongoing basis further undercuts the ALJ's conclusion that E.M.'s treatment was conservative.  *See Tunstell v. Astrue*, No. CV 11-9462-SP, 2012 WL 3765139, at *4 (C.D. Cal. Aug. 30, 2012) (finding that treatment was not conservative where claimant took hydrocodone for pain and collecting cases).[5]  The Court also notes that there is no suggestion that any more aggressive treatment was available to E.M. to alleviate his symptoms.  Rather, the only evidence in the record is that his surgeon, Dr. Iezza, concluded that further surgery would *not* improve E.M.'s condition.  AR at 427.  Thus, the ALJ's reliance on the routine and conservative nature of E.M. treatment was misplaced.

Furthermore, the record reflects that despite the improvement Dr. Iezza and some other treatment providers observed in the months following E.M.'s fusion surgery, none of the treatments E.M. received (including the surgery) was particularly effective in managing E.M.'s symptoms – in particular, his back pain and muscle spasms.  *See, e.g.*, AR at 572 (May 6, 2016 treatment note describing E.M.'s back pain with muscular spasm and noting that "[p]atient has tried and failed Conservative Measures such as "Physical Therapy, NSAIDs, Ice, Heat, Exercise and Stretching").   As discussed above, E.M. continued to take strong pain medication and to

---

[5] The Court notes that although there is one treatment note, from July 1, 2015, in which Dr. Iezza stated that E.M. had "weaned himself" from Norco, AR at 433, it is unclear how long this lasted. What is clear is that E.M.'s pain continued and that by October 2015, E.M.'s treating physician Dr. Tran, was advising E.M. that he should be on stronger pain medication and began a series of epidural injections.  AR at 489.  Given that Dr. Iezza had apparently cautioned E.M. about his use of narcotic pain medication at his June 3, 2015 visit, *id.* at 435, E.M.'s brief attempt to go without this medication is not substantial evidence that he did not experience significant back pain and spasms during this period.

United States District Court
Northern District of California

require repeated epidural injections for his pain after his surgery.  In addition, these observations must be considered in the context of the overall medical records, which reflect that E.M. experienced "severe and disabling" low back pain, numbness and tingling in the period *prior* to the fusion surgery.  AR at 441 (February 24, 2015 treatment note of Dr. Iezza); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (cautioning that a doctor's statements that a patient is doing well must be considered in the context of the overall diagnostic picture).  The observations by treatment providers that E.M. was "improving" as compared to his condition prior to his spinal fusion surgery (which were limited to a period of months following E.M.'s surgery) are not a clear and convincing reason to discount E.M.'s allegations with regard to his subjective symptoms.

Accordingly, the Court concludes that the ALJ's finding that E.M.'s pain was well managed by conservative treatment is not supported by substantial evidence in the record and that this is not a specific, clear and convincing reason to reject E.M.'s testimony about his subjective symptoms.

### 2.   Activities of Daily Living

As a further reason for declining to credit E.M.'s subjective symptom testimony the ALJ pointed to E.M.'s daily activities, citing in particular the fact that E.M. engaged in "gardening and raising chickens," and that he "even performed part time work as an Uber driver in November 2016." AR at 36.   The Court finds that these activities are not a specific, clear or convincing reason to reject E.M.'s subjective symptom testimony.

In the Ninth Circuit, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).  However, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995,

1016 (9th Cir. 2014); *see also Vertigan v. Halter*, 260 F.3d 1044, 1049–50 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").  Thus, "[r]ecognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,' [the Ninth Circuit has] held that '[o]nly if [their] level of activity were inconsistent with [a claimant's] claimed limitations would these activities have any bearing on [their] credibility.'"  *Garrison v. Colvin*, 759 F.3d at 1016 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

Here, the ALJ relied on E.M.'s testimony about growing vegetables and keeping a few chickens to discount his symptom testimony, but she pointed to no specific aspects of these activities that reflect an ability to function that was inconsistent with E.M.'s symptom testimony.  Indeed, the ALJ did not ask E.M. what specific tasks he performed with respect to the garden and the chickens and there is no evidence in the record on that question.  Further, to the extent that E.M. used the term "we" in describing these activities, which the Court presumes is a reference to E.M. and his girlfriend, the ALJ's apparent assumption that it was E.M. (as opposed to his girlfriend) who performed whatever chores the garden and the chickens entailed was entirely speculative.

Nor was E.M.'s part-time work for Uber an adequate reason to reject E.M.'s symptom testimony because the ALJ simply pointed generally to that work without offering any explanation for why E.M.'s part-time driving for Uber – as he described it – showed that he was exaggerating his functional limitations.  Given that E.M. testified that when he drove for Uber he typically did so for under two hours, that some days he was unable to drive at all, that he needed to take frequent breaks from driving to walk around, and that had to stop driving on some days when he had muscle spasms, E.M.'s testimony appears to be consistent with his testimony about his subjective symptoms.  Because ALJ made only a conclusory statement about E.M.'s driving and did not explain why this activity was inconsistent with his alleged limitations, her reliance on this activity was not a specific, clear and convincing reason to reject his symptom testimony.

United States District Court
Northern District of California

1

United States District Court
Northern District of California

### C.    The ALJ Erred When She Disregarded the Opinions of Dr. Burt

2      "[T]he opinion of an examining doctor, even if contradicted by another doctor, can only be

3    rejected for specific and legitimate reasons that are supported by substantial evidence in the

4    record."[6]  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citing *Andrews v. Shalala*, 53 F.3d

5    1035, 1043 (9th Cir. 1995)).   Here, the ALJ gave only "some weight" to the opinions of Dr. Burt,

6    accepting his opinion that E.M. was limited to sedentary work but rejecting his opinion that E.M.'s

7    functional limitations prevented him from performing the full range of sedentary work.[7]  She

8    offered three reasons for her conclusions: 1) Dr. Burt's opinion "cites to vague examination results

9    that are inconsistent with the claimant's conservative care and improvements following surgery";

10   2)  Dr. Burt's opinion was based on E.M.'s subjective complaints; and 3) Dr. Burt's opinions were

11   inconsistent with E.M.'s  "work activity."   AR at 35.   The Court finds that these reasons are not

12   legitimate reasons supported by substantial evidence.

13          First, the ALJ's reliance on E.M.'s conservative care and "improvements following

14   surgery" is misplaced for the reasons discussed above.  In particular, E.M.'s record shows that his

15   care was *not* conservative as he needed to take narcotic pain medicine on an almost continuous

16   basis and received repeated epidural shots.  Moreover, in the context of the record as a whole,

17   references to improvements in the months following surgery are not inconsistent with E.M.'s

18   testimony that he continued to experience significant pain and muscle spasms.

19          Similarly, the ALJ's conclusion that Dr. Burt's opinions about E.M.'s limitations should

20

21   [6] The regulations governing treatment of medical evidence have been amended with respect to
     applications filed on or after March 27, 2017.  *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. §

22   404.1520c. Because E.M. filed his application before that date, *see* AR at 119, the older
     framework applies.  This order need not consider what effect the regulatory change has on Ninth

23   Circuit precedent regarding the weight afforded to different categories of medical opinions.
     [7]The Social Security regulations define "sedentary work" as follows:

24          Sedentary work involves lifting no more than 10 pounds at a time and occasionally
            lifting or carrying articles like docket files, ledgers, and small tools. Although a

25          sedentary job is defined as one which involves sitting, a certain amount of walking and
            standing is often necessary in carrying out job duties. Jobs are sedentary if walking and

26          standing are required occasionally and other sedentary criteria are met.

27   20 C.F.R. § 404.1567(a).   *See also Tackett v. Apfel*, 180 F.3d 1094, 1103 (9th Cir.
     1999)("'Sedentary work' contemplates work that involves the ability to sit through most or all of

28   an eight hour day[.]").

United States District Court
Northern District of California

1  not be fully credited because Dr. Burt relied on E.M.'s subjective complaints fails for the same

2  reasons her credibility determination was flawed.  While an ALJ may reject a physician's opinion

3  if it is "based to a large extent on a claimant's self-reports that have been properly discounted as

4  incredible," *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (internal quotation marks

5  omitted), E.M.'s reports have *not* been properly discounted for the reasons discussed above.

6        Finally,  the ALJ did not provide an adequate reason for disregarding Dr. Burt's

7  restrictions by citing E.M.'s work activity, which the Court construes as E.M.'s work as an Uber

8  driver.  In finding that E.M. could perform a full range of sedentary work, the ALJ rejected Dr.

9  Burt's opinion that E.M. was limited to standing and walking less than 2 hours of an 8-hour

10  workday and sitting about two hours in an eight-hour workday, that he would need to take

11  unscheduled breaks and that he would likely be absent from work more than three days a month.

12  AR at 693-694.   Yet E.M.'s testimony about his work as an Uber driver was not inconsistent with

13  these limitations.  He testified that he only drove two hours in any particular day and had to take

14  frequent breaks to walk around, that he sometimes had to stop driving due to muscle spasms and

15  that on some days he could not drive at all due to his pain.  The ALJ did not explain how E.M.'s

16  driving for Uber – as he actually performed that work – was inconsistent with Dr. Burt's opinions

17  with respect to E.M.'s functional limitations.  Therefore, the Court finds that this was not a

18  legitimate reason to reject Dr. Burt's opinions and it was not supported by substantial evidence.[8]

19      **D.**    **Remedy**

20        "A district court may affirm, modify, or reverse a decision by the Commissioner 'with or

21  without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42

22  U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original

23  administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654

---

[8] The Commissioner argues that the ALJ could also reject Dr. Burt's opinion on the basis that
E.M. "sought out" Dr. Burt, citing *Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir. 1996) for the
proposition that "an ALJ may reasonably consider the fact that a doctor's opinion was solicited by
counsel." Defendant's Motion for Summary Judgment at 3.  The ALJ did not cite this reason for
rejecting Dr. Burt's opinion, however, and therefore the Court does not consider this reason.  *See
Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("We review only the reasons provided by the
ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did
not rely.").

United States District Court
Northern District of California

1    F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits

2    under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for

3    rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no]

4    outstanding issues that must be resolved before a disability determination can be made" and

5    "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a

6    whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017)

7    (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

8    a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

9    case). The "credit-as-true" rule does not apply "when the record as a whole creates serious doubt

10   as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

11   *Garrison v. Colvin*, 759 F.3d at 1021, or when "there is a need to resolve conflicts and

12   ambiguities." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

13         Here, the Court declines to award benefits under the credit-as-true rule.  Although the ALJ

14   erred when she found that E.M. could perform almost a full range of sedentary work  and she

15   improperly discounted the opinions of both Dr. Burt and E.M. that support the inclusion of

16   additional functional limitations in E.M.'s RFC related to his limited ability to sit, stand or walk

17   for prolonged periods, his need to take breaks (including unscheduled breaks) and his inability to

18   work multiple days a month, the Court concludes that further proceedings are required to resolve

19   conflicts and ambiguities in the record as to E.M.'s limitations.  The Court notes that applying the

20   "credit-as-true" rule in this case is complicated by the fact that E.M.'s allegations about his

21   subjective symptoms and his daily activities are somewhat ambiguous and in some cases are not

22   entirely in alignment with Dr. Burt's opinions about his limitations.  For example, Dr. Burt opined

23   that E.M. is in pain after 10 minutes of sitting and cannot sit for more than 20 minutes at a time,

24   AR at 684, 693, while E.M. testified that he needs to take breaks when he is driving for Uber on

25   average every 30 minutes.  AR 68.  While this testimony is not necessarily inconsistent – both Dr.

26   Burt and E.M. testified that the amount of time E.M. can perform certain activities varies – it

27   suggests that further proceedings would be helpful to determine what specific additional

28   limitations are appropriate and whether all work is precluded under an RFC that is free from legal

error and supported by substantial evidence.  Therefore, the Court remands the matter to the Commissioner for further proceedings.

## IV.     CONCLUSION

For the reasons discussed above, E.M.'s motion is GRANTED, the Commissioner's motion is DENIED and the matter is REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk is instructed to enter a judgment accordingly.

**IT IS SO ORDERED.**

Dated:  September 27, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge